IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CHARLES S.,[1]

    Plaintiff,

vs.

ANDREW SAUL, Commissioner of Social Security,

    Defendant.

No. 18-cv-1092-JPG-DGW

## MEMORANDUM AND ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Charles S. seeks judicial review pursuant to 42 U.S.C. § 423 *et seq.* of the final agency decision denying his application for Disability Insurance Benefits (DIB).

### Procedural History

The plaintiff applied for benefits in August 2014 alleging disability beginning on July 8, 2012. After holding an evidentiary hearing via video on March 28, 2017, Administrative Law Judge (ALJ) Gregory M. Beatty denied the plaintiff's application on April 7, 2017. (Tr. 18-25.) The Appeals Council denied review on April 10, 2018, and the decision of the ALJ became the final agency decision subject to judicial review. (Tr. 1-6.) The plaintiff has exhausted his administrative remedies and filed a timely complaint with the Court.

### Issue Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred in failing to consider relevant and material medical evidence from after November 2012.

2. The ALJ erred in evaluating the plaintiff's subjective complaints about the intensity,

---

[1] The Court will not use plaintiff's full name in this Memorandum and Order to protect his privacy. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

persistence, and limiting effects of his impairments because the ALJ did not consider it in light of medical evidence from after November 2012.

## **Applicable Legal Standards**

To qualify for benefits, a claimant must be "disabled" pursuant to the Social Security Act. The Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must result from a medically demonstrable abnormality. 42 U.S.C. § 423(d)(3). Moreover, the impairment must prevent the plaintiff from engaging in significant physical or mental work activity done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations require an ALJ to ask five questions when determining whether a claimant is disabled. The first three questions are simple: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe physical or mental impairment; and (3) whether that impairment meets or is equivalent to one of the listed impairments that the regulations acknowledge to be conclusively disabling. 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. Part 404, Subpart P, App'x 1; *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). An impairment is "medically equivalent to a listed impairment . . . if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). If the answers to these questions are "yes," then the ALJ should find that the claimant is disabled. *Id.*

At times, an ALJ may find that the claimant is unemployed and has a serious impairment, but that the impairment is neither listed in nor equivalent to the impairments in the regulations—failing at step three. If this happens, then the ALJ must ask a fourth question: (4) whether the claimant is able to perform his or her previous work. *Id.* If the claimant is not able to, then the

burden shifts to the Commissioner to answer a fifth and final question: (5) whether the claimant is capable of performing *any* work within the economy, in light of the claimant's age, education, and work experience. If the claimant cannot, then the ALJ should find the claimant to be disabled. *Id*.; *see also Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

A claimant may appeal the final decision of the Social Security Administration to this Court, but the scope of review here is limited: while the Court must ensure that the ALJ did not make any errors of law, the ALJ's findings of fact are conclusive as long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable person would find sufficient to support a decision. *Weatherbee*, 649 F.3d at 568 (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). The Court takes into account the entire administrative record when reviewing for substantial evidence, but it does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). But even though this judicial review is limited, the Court should not and does not act as a rubber stamp for the Commissioner. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

### **The Decision of the ALJ**

ALJ Beatty followed the five-step analytical framework described above:

Step 1: The ALJ determined that plaintiff had not worked from the alleged onset date of July 8, 2012, to the date last insured (DLI) of December 31, 2012.

Step 2: The ALJ found that plaintiff had severe impairments of degenerative disk disease, a pars defect, spondylolisthesis of the lumbar spine with osteoporosis—status post kyphoplasty and fusion surgeries.[2]

---

[2] Degenerative disk disease is "a condition in which a damaged [spinal] disc causes pain." Cedars Sinai, Health Library, Degenerative Disk Disease, https://www.cedars-sinai.org/health-library/

3

| Step 3: | The ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. |
|---|---|
| Step 4: | The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the light exertional level with some physical limitations and that, with those restrictions, he was unable to perform her past relevant work as an inspector/hand packager or a cleaner/janitor. |
| Step 5: | The ALJ found, based upon plaintiff's age, education, work experience, and RFC, as well as the testimony of a vocational expert (VE), that plaintiff was capable of performing other jobs that exist in significant numbers in the national economy. Consequently, the ALJ concluded that plaintiff was not disabled. |

Plaintiff faults the ALJ for failing to consider relevant medical evidence from after the DLI of December 31, 2012, in formulating his RFC determination and in assessing plaintiff's subjective complaints.

## **The Evidentiary Record**

---

diseases-and-conditions/d/degenerative-disc-disease.html (visited Jan. 29, 2020). A pars defect, also called spondylolysis, is "a stress fracture of the bones of the lower spine." Washington University Orthopedics, Spondylolysis/Pars Defect, https://www.ortho.wustl.edu/content/Patient-Care/6884/Services/Pediatric-and-Adolescent-Orthopedic-Surgery/Overview/Pediatric-Spine-Patient-Education-Overview/ SpondylolysisPars-Defect.aspx (visited Jan. 29, 2020). Spondylolisthesis is a painful spinal condition that "causes one of the lower vertebrae to slip forward onto the bone directly beneath it." Healthline, Spondylolisthesis, https://www. healthline.com/ health/spondylolisthesis (visited Jan. 29, 2020). Osteoporosis "causes bones to become weak and brittle—so brittle that a fall or even mild stresses such as bending over or coughing can cause a fracture." Mayo Clinic, Diseases and Conditions, Osteoporosis, https://www.mayoclinic.org/ diseases-conditions/osteoporosis/symptoms-causes/syc-20351968 (visited Jan. 29, 2020). Kyphoplasty "uses special balloons to create spaces within the vertebra that are then filled with bone cement" and is used to stabilize compression fractures in the spine. Mayo Clinic, Tests and Procedures, Vertebroplasty, https://www.mayoclinic.org/tests-procedures/vertebroplasty/about/ pac-20385207 (visited Jan. 29, 2020). Fusion surgery is "surgery to permanently connect two or more vertebrae in your spine, eliminating motion between them. . . . During spinal fusion, your surgeon places bone or a bonelike material within the space between two spinal vertebrae. Metal plates, screws and rods may be used to hold the vertebrae together, so they can heal into one solid unit." Mayo Clinic, Tests and Procedures, Spinal Fusion, https://www.mayoclinic.org/tests-procedures/spinal-fusion/about/pac-20384523 (visited Jan. 29, 2020).

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

Plaintiff was born in 1961 and was 50 years old on the alleged onset date of July 8, 2012. (Tr. 170). He was last insured for disability benefits on December 31, 2012. (Tr. 178-79). He had worked before as quality control technician and a building service worker. (Tr. 220.) In September 2014, he submitted a Function Report claiming he was limited in his ability to work because of back pain and neuropathy/nerve damage in his thighs that severely limited his ability for sustained standing and walking. (Tr. 235.) He also reported limitations in his abilities and daily activities. (Tr. 236-42.) In September 2015, he submitted another Function Report claiming he was limited in his ability to work because of his back and neck conditions that impaired his mobility and that limited his range of motion, his standing, sitting, walking, his ability to turn his neck or look up or down. (Tr. 263.) He continued to report limitations in his abilities and daily activities. (Tr. 263-72.)

2. **Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing in March 2017. (Tr. 30-55.) Plaintiff testified that in 2012 he lived by himself. He worked up until July 2012, when he was struck with an acute pain in his back, and he did not work for the rest of 2012. After he stopped working, he could not do anything and spent most of the day in a recliner, the only place he was comfortable. Spending any length of time in any other chair left him in pain. It took him forty-five minutes to an hour to get dressed and ready in the morning, he made simple meals, and he spent the rest of the day in a recliner unless he had an appointment. He did few activities outside the house, and riding in a car to an appointment aggravated his pain. He had a hard time showering

5

because of the bending and twisting necessary. His family did household chores for him like cleaning and dishwashing and ran errands for him like grocery shopping. He testified that he could not be on his feet for any length of time,[3] walk for 50 yards, or do any kind of bending or twisting without pain. From July to December 2012, he drove only very short distances of a couple of blocks. He confined himself to such short distances for safety reasons because he had problems turning around to look behind him to see other cars. (Tr. 35-37, 40-42, 44-46.)

Plaintiff described his pain from July to December 2012 as in the lumbar region across his buttocks and down into his hip. He had three or four physical therapy sessions in 2012. He was only able to get about four good hours of sleep a night because he needed to adjust his position due to pain. His condition has never improved, and if he started doing something to aggravate his pain, the pain occurred for the rest of that day and the next day. By the time of the hearing, he still had pain, but it had diminished to some extent, although it increased with activity. (Tr. 41-42, 44.)

Plaintiff testified that he was a high school graduate. In the past, plaintiff had worked as an operator on a line making compact discs (CDs) and digital virtual discs (DVDs). He had also worked for Southern Illinois University as a building service worker, a janitorial job. (Tr. 37-40.)

### 3. Medical Records

Medical records show plaintiff has suffered from back problems since approximately 2009-10, when he injured his back at work, long before his alleged onset date of July 8, 2012. He was diagnosed with discogenic pain of the lumbar spine; degenerative disk disease of the L5/S1 interval; degenerative joint disease of the lumbar spine; Grade 1 spondylolisthesis at the L5/S1

---

[3] The ALJ erroneously described plaintiff's testimony as "the inability to feel his feet for any length of time," but it is clear from the context that the ALJ's description was a scrivener's error and that he actually understood plaintiff's testimony correctly as stating an inability to "be on his feet."

6

interval; bilateral L5 pars defect; and spinal instability of the L5/L1 interval. After getting insufficient relief from his pain from chiropractic treatments, medication, cold compresses, and epidural injections, on January 30, 2012, plaintiff had an anterior lumbar interbody fusion and posterolateral fusion of the L5/S1 interval with anterior and posterior instrumentation (in other words, a surgical fusion of L5/S1 with instrument(s) implanted to stabilize the spine and maintain proper alignment while bone fusion occurred). The surgery was performed by Tony Chien, D.O., at Mineral Area Regional Medical Center. Plaintiff was prescribed medications and began physical therapy the day after surgery. (Tr. 307-08, 318, 320-22.)

Follow-up x-rays were performed in the following months at Sparta Memorial Hospital. X-rays taken on February 17, 2012, showed post-operative changes and noted L5 spondylolysis with a slight anterior offset of L5 in relation to S1. (Tr. 345.) X-rays taken on March 15, 2012, showed the L5/S1 fusion appeared intact and alignment was stable without focal bone destruction. The report also noted no significant feature of spondylosis above the L5/S1 level and mild degenerative sclerosis within the sacroiliac joints. (Tr. 344.) X-rays taken on April 20, 2012, showed the orthopedic hardware used in the L5/S1 fusion appeared intact, the alignment was stable, and there was no evidence of prosthetic loosening. (Tr. 343.) X-rays taken on May 4, 2012, showed the orthopedic hardware appeared intact and the alignment stable with no local bone destruction, and the report noted mild degenerative spondylosis at higher levels. (Tr. 342.) X-rays taken on June 1, 2012, showed the same. (Tr. 341.)

After the sudden pain in plaintiff's back on July 6, 2012, Dr. Chien diagnosed plaintiff with osteoporosis and an acute compression fracture of L2 and treated it with kyphoplasty at Sparta Community Hospital. (Tr. 336-37.)

Follow-up x-rays were performed in the following months at Sparta Community Hospital.

7

X-rays taken on July 20, 2012, showed the L5/S1 fusion was stable and the L2 compression fracture treated with kyphoplasty. (Tr. 333.) X-rays taken on August 2, 2012, showed no post-operative changes in the L5/S1 fusion or the L2 vertebroplasty and noted mild spondylolisthesis at L5. (Tr. 332.) X-rays taken on August 31, 2012, showed no post-operative changes at L2 with mild compression or at L5/S1, and the report noted slight spondylolisthesis with L5 slightly forward from S1 and L4. (Tr. 331.) X-rays taken November 1, 2012, showed that the compression fracture treated by kyphoplasty at L2 and the L5/S1 fusion were stable, and the x-ray report noted chronic mild sclerosis bilateral in sacroiliac joints and hips. (Tr. 330.) X-rays taken on November 30, 2012, showed that the compression fracture at L2 treated by kyphoplasty and the L5/S1 fusion were stable, that orthopedic hardware used in the fusion appeared intact, and that the fusion alignment was stable with no focal bone destruction. (Tr. 329.) X-rays taken on January 11, 2013, showed the same. (Tr. 328.)

On February 20, 2013, plaintiff began seeing Sonjay Joseph Fonn, D.O., for continuing leg and back pain. Plaintiff reported that his pain was somewhat relieved after the January 2012 surgery but that his pain was progressively getting worse. In his assessment of plaintiff, Dr. Fonn noted that plaintiff had 5/5 motor strength throughout, normal gait and station, normal tone with no atrophy or fasciculations, and pain to palpation in the low back region. Dr. Fonn assessed plaintiff as having "what appear[ed] to be a possible failed fusion at the L5/S1 level."[4] (Tr. 392-94.) X-rays performed on that day showed the fusion with no acute migration, subluxation (dislocation), or fracture. (Tr. 418.) On March 21, 2013, Dr. Fonn opined that, based on CT and

---

[4] Plaintiff's counsel mischaracterized Dr. Fonn's assessment by referring to it as a "likely" failed fusion rather than a "possible" failed fusion. The Court reminds counsel of his obligation to be candid with the Court and not to mispresent evidence.

8

MRI scans, he did not believe there was a solid fusion or adequate decompression at the L5/S1 level. He instructed that plaintiff "remain on light duties" for a month. (Tr. 390.) An MRI and a CT scan performed June 18, 2013, showed the fusion hardware intact without evidence of loosening, but also essentially no osseous fusion between the two vertebral bodies. (Tr. 409-11.) Dr. Fonn eventually determined that the January 2012 fusion had failed. On September 27, 2013, Dr. Fonn performed a "redo" of the L5/S1 fusion at St. Francis Medical Center, which resulted in a good fusion and a substantial reduction in pre-operative symptoms. (Tr. 429-30, 361-64, 368.)

On February 12, 2014, Dr. Fonn directed that plaintiff remain on "light duty" until he completed physical and aquatic therapy and trigger injections. (Tr. 367.) On March 19, 2014, Dr. Fonn instructed that plaintiff should remain off work for three months. (Tr. 364.)

On January 23, 2017, James Richards, M.D., who had treated plaintiff since 2016, opined on certain functional limitations plaintiff had in working. (Tr. 782-86.)

### 4. State Agency Reviewing Physicians

In December 2014, state agency reviewing physician B. Rock Oh, M.D., reviewed plaintiff's medical records on initial review, including post-DLI treatment records from Dr. Fonn. Dr. Oh noted that there was no physical examination on file between plaintiff's alleged onset date of July 8, 2012, and his DLI of December 31, 2012. He noted that a pre-onset date x-ray showed a stable fusion, and that Dr. Fonn's February 20, 2013, examination, the first done after the DLI, revealed that plaintiff's gait and station were normal, his strength was 5/5 throughout, and an x-ray showed a stable fusion. (Tr. 58.) Dr. Oh determined from his review that plaintiff had a medically determinable impairment at the relevant time, but that the objective medical evidence, including plaintiff's failure to seek treatment other than medication during the relevant period, did not support plaintiff's statements about the intensity, persistence and functionally limiting effects

9

of his impairment. (Tr. 59.) Dr. Oh concluded that plaintiff had the residual functional capacity that would not prevent him from performing light work (Tr. 61-63.)

In March 2015, state agency reviewing physician Julio Pardo, M.D. ,reviewed plaintiff's medical records on reconsideration. Dr. Pardo came to the same conclusions as Dr. Oh. (Tr. 69-73.)

### Analysis

Plaintiff complains that ALJ Beatty did not consider and discuss relevant and material medical information from after November 2012, namely, medical information dating from his first visit to Dr. Fonn in February 2013. He claims that this failure led to an erroneous evaluation of plaintiff's subjective complaints.

The ALJ's analysis in question begins at Step 4. After finding that plaintiff suffered an impairment that could reasonably be expected to produce his pain and other symptoms, the ALJ evaluated the intensity, persistence and limiting effects of those symptoms considering substantiating objective medical evidence. (Tr. 21-22.) Specifically, the ALJ cited plaintiff's medical history related to his back beginning in January 2012 when he first had spinal fusion surgery and continuing up to November 30, 2012, the latest pre-DLI medical record. (Tr. 22-23.) Earlier, he mentioned Dr. Fonn's "redo" of the fusion in September 2013, and he listed Dr. Fonn's treatment records from February 2013 to September 2014 as records he consulted in forming his opinion. (Tr. 22, 29.) The ALJ noted the unremarkable findings of physical examinations and diagnostic tests from January to November 2012. He further noted very little additional treatment other than obtaining x-rays—all of which showed a stable fusion—between the alleged onset date and the DLI. (Tr. 22-23.) The ALJ did not, however, specifically mention Dr. Fonn's medical records from 2012, which showed no osseous fusion after the January 2012 fusion surgery,

insufficient decompression, and loose hardware that was easily removed in the September 2013 "redo" surgery. The ALJ relied on the unremarkable pre-DLI medical tests and the lack of ongoing treatment during the relevant period to find plaintiff's subjective complaints inconsistent with a disabling or severe limitation of functioning. (Tr. 23.)

  1. <u>Failure to Consider Evidence</u>

It is undisputed that the ALJ must consider all evidence in the administrative record. 20 C.F.R. § 404.1520(a)(3). This includes post-DLI evidence because it may be relevant to the pre-DLI period. *Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984) ("There can be no doubt that medical evidence from a time subsequent to a certain period is relevant to a determination of a claimant's condition during that period."). While the ALJ need not discuss every piece of evidence, he must build a logical bridge from the evidence to the conclusion. *Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014), as amended (Aug. 20, 2014).

Plaintiff argues that ALJ Beatty failed to consider relevant post-DLI evidence, particularly Dr. Fonn's medical records from 2013, including the specific observations during plaintiff's "redo" fusion surgery in September 2013. Specifically, the more sophisticated CT and MRI scans from March 2013 and Dr. Fonn's observation of loose hardware during the "redo" suggest that the apparently stable hardware shown in earlier pre-DLI x-rays may not have been stable at all.

The Commissioner argues that the records plaintiff says the ALJ failed to consider did not shed any light on his limitations before the DLI because they show that in February 2013 he had good motor strength, normal gait and station, normal tone with no atrophy or fasciculations with some pain on palpation, and that diagnostic tests revealed a stable fusion with hardware intact. The Commissioner argues that there remains insufficient evidence of disabling limitations pre-DLI, even if Dr. Fonn's post-DLI records are considered. The Commissioner also suggests the

ALJ adequately considered the post-DLI records by giving weight to the state agency reviewing physicians' opinions that considered those records.

The problem is that the ALJ failed to even mention, much less discuss, the 2013 records from Dr. Fonn and what they do or do not imply about plaintiff's pre-DLI condition. The medical records mentioned by the ALJ show that the hardware from the January 2012 fusion was stable, but Dr. Fonn's later records show that there was no osseous fusion occurring by March 2013, inadequate decompression, and loose hardware in September 2013. The logical conclusion to be drawn from Dr. Fonn's observations is that there had been no osseous fusion pre-DLI either, but the ALJ does not explain how he reconciled x-rays showing stable hardware with later observations of loose hardware or how apparently stable hardware without osseous fusion would have manifested itself in pain or limitations. The failure to discuss the 2013 evidence from Dr. Fonn makes it impossible for the Court to tell whether the ALJ considered and dismissed the evidence or completely failed to consider it. *See Plessinger v. Berryhill*, 900 F.3d 909, 917 (7th Cir. 2018) (citing *Minnick v. Colvin*, 775 F.3d 929, 936 (7th Cir. 2015)).

In fact, the ALJ cherry-picked evidence favorable to the Commissioner, which he cannot do. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (noting that the ALJ must "consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding"). The ALJ seized on Dr. Fonn's 2014 indication that plaintiff could do "light work" but ignored other potential evidence that could support a finding of disability—that by March 2013 there was no osseous fusion of the January 2012 fusion surgery, inadequate decompression, moderate foraminal narrowing at L5/S1, and loose hardware that was easily removed in the September 2013 "redo" of the fusion surgery. The ALJ did not even mention Dr. Fonn's initial observations of plaintiff in February 2013 at

12

which time plaintiff described his pain as disabling. The implications of the potentially negative evidence not mentioned by the ALJ may be insignificant, but the ALJ needs to at least acknowledge it and explain why it is not supportive of plaintiff's claimed pre-DLI limitations. Otherwise, there is no logical bridge between the evidence and the ALJ's conclusion.

It is true that the Commissioner makes logical arguments that could be drawn from the evidence that would support the ALJ's conclusion. However, the Commissioner's reasoning is nowhere in the ALJ's decision. In advancing a reason not relied upon by the ALJ, the Commissioner violates the *Chenery* doctrine. *See SEC v. Chenery Corp.*, 318 U.S. 80 (1943). "Under the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace." *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012).

    2.    <u>Evaluation of Symptoms</u>

When evaluating the subjective complaints of a claimant, the ALJ asks two questions: (1) whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the symptoms, and (2) whether the limitations posed by the intensity and persistence of those symptoms limit the individual's ability to perform work-related activities. Social Security Ruling (SSR) 16-3p, 2017 WL 5180304, at *3 (Oct. 25, 2017).[5] When ALJs find at the first step that an individual has a medically determinable impairment that could reasonably be expected to produce the symptoms suffered, ALJs must consider "all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms," including

---

[5] Although this citation to SSR 16-3p post-dates the ALJ's decision in this case, the version in place at the time of the April 7, 2017, ALJ's decision—thus the version applying to this review— was substantively the same. *See* SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016) (original publication).

13

the objective medical evidence and "any other relevant evidence in the individual's case record." *Id.* at *2, *4; 20 C.F.R. § 404.1529(c)(1) The ALJ should consider whether the individual's description of the intensity, persistence, and limiting effects of symptoms like pain are consistent with the objective medical evidence, but if they are not, the ALJ cannot disregard the description solely because it is not substantiated by objective medical evidence. SSR 16-3p at *5; 20 C.F.R. § 404.1529(c)(2). The ALJ must also consider other relevant evidence. 20 C.F.R. § 404.1529(c)(3). Where the treatment an individual sought is not comparable with the degree of his subjective complaints, the ALJ must consider possible reasons for the failure to seek more or different treatment before finding the subjective complaints inconsistent with the evidence in the record. SSR 16-3p at *9.

The Court affords a hearing officer's evaluation of a plaintiff's symptoms special deference because the ALJ is in the best position to see and hear the witnesses and to assess their forthrightness. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019); *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). The Court will reverse the ALJ's symptom evaluation only if the claimant shows it is so lacking in explanation or support that it is "patently wrong." *Burmester*, 920 F.3d at 510; *John S. v. Saul*, No. 119CV01008DLPJRS, 2020 WL 428093, at *9 (S.D. Ind. Jan. 27, 2020) (applying "patently wrong" standard under SSR 16-3p).

The plaintiff argues that the ALJ erred in relying on the factors he did to reject plaintiff's description of the intensity, persistence, and limiting effects of his symptoms: his failure to get additional medical treatment between the alleged onset date and the DLI, and the x-rays showing a stable compression fracture and spinal fusion. He specifically objects to the ALJ ignoring the entire line of evidence presented by Dr. Fonn's ultimate finding of no osseous fusion and insufficient decompression.

The Commissioner argues that the ALJ sufficiently explained his assessment of plaintiff's subjective complaints by referring to unremarkable objective medical evidence and plaintiff's failure to seek ongoing treatment during the relevant period.

The Court finds that the ALJ's failure to acknowledge and discuss Dr. Fonn's 2013 records is fatal to his assessment of plaintiff's subjective complaints. Specifically, as noted above, there is evidence showing that there was no osseous fusion or adequate decompression during the relevant periods, but there is no indication the ALJ considered this evidence in evaluating the intensity, persistence, and limiting effects of plaintiff's symptoms.

Additionally, the ALJ relied on plaintiff's failure to seek medical treatment between the alleged onset date and his DLI. However, he never inquired of plaintiff why that was. An ALJ cannot hold against a plaintiff the fact that he did not seek medical treatment where there was a good reason for not doing so. *See* SSR 16-3p at *9. He further failed to specify what treatment plaintiff should have sought but did not. *See Martinez v. Astrue*, No. 2:10-CV-370-PRC, 2011 WL 4834252, at *8 (N.D. Ind. Oct. 11, 2011) ("The ALJ may 'consider conservative treatment in assessing the severity of a condition,' but should cite medical evidence about what kind of treatment would be appropriate.").

Because the Commissioner erred as a matter of law by failing to consider all the relevant evidence, the ALJ's symptom evaluation and RFC finding and thus, his finding at Step 5 are not supported by substantial evidence. Therefore, this case must be remanded to the Commissioner for rehearing. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Charles S.'s application for DIB and is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of Court is **DIRECTED** to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**
**DATED: January 30, 2020**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**